FILED

2025 Sep-30  AM 11:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **JENNIFER PARTEN,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **Case No.: 2:24-cv-00381-ACA** |
| | ] | |
| **COMMISSIONER, SOCIAL** | ] | |
| **SECURITY ADMINISTRATION,** | ] | |
| | ] | |
| **Defendant.** | ] | |
| | ] | |

## MEMORANDUM OPINION

Plaintiff Jennifer Parten appeals the Social Security Commissioner's denial of her claim for supplemental security income. (Doc. 1). After review of the administrative record and the parties' briefs, the court **WILL AFFIRM** the Commissioner's decision.

## I.    PROCEDURAL HISTORY

Ms. Parten applied for supplemental security income in March 2011, alleging a disability beginning June 1, 2008. (Doc. 5-6 at 2). She later amended the onset date to March 18, 2011. (Doc. 5-3 at 62). The Commissioner denied Ms. Parten's initial claim, and Ms. Parten requested a hearing before an administrative law judge ("ALJ"). (Doc. 5-5 at 2–4, 10). After the hearing (doc. 5-3 at 59–92), the ALJ issued an unfavorable decision (*id.* at 44–53). The Appeals Council denied Ms. Parten's

request for review, so she appealed. (Doc 5-3 at 23; doc. 5-11 at 31–32). The district court reversed and remanded the decision because substantial evidence did not support the ALJ's rejection of certain medical opinions, and the ALJ had not addressed Ms. Parten's poverty status when considering her compliance with her medication regimen. (Doc. 5-11 at 45–51).

On remand, the ALJ held a second hearing. (Doc. 5-10 at 36–98). The ALJ again issued an unfavorable opinion, and the Appeals Council denied Ms. Parten's request for review. (*Id.* at 2–4, 17–30). On appeal, the district court reversed and remanded because substantial evidence did not support the ALJ's decision to discount Ms. Parten's subjective testimony of her symptoms. (Doc. 5-17 at 36–65). Specifically, the ALJ failed to "(1) consider the claimant's inability to pay for medication; (2) sufficiently consider the side effects of the claimant's medication; (3) find with sufficient evidence that the claimant's activities contradict her testimony of her symptoms; and (4) sufficiently consider the claimant's difficulties with her activities." (*Id.* at 64).

On remand for a second time, Ms. Parten received a third hearing. (Doc. 5-16 at 46–111). The ALJ again found that she was not disabled and denied the claim, and the Appeals Council declined to review the decision. (*See* doc. 5-16 at 2, 17–37). Accordingly, the Commissioner's decision is final and ripe for the court's judicial review. *See* 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The court's role in reviewing claims under the Social Security Act is narrow. The court "must determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (quotation marks omitted). "Under the substantial evidence standard, this court will affirm the ALJ's decision if there exists such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) (quotation marks omitted). The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." *Winschel*, 631 F.3d at 1178 (quotation marks omitted). The court must affirm "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158–59 (11th Cir. 2004) (quotation marks omitted).

Despite the deferential standard of review, the court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Henry*, 802 F.3d at 1267. The court must reverse the Commissioner's decision if the ALJ does not apply the correct legal standards or "provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

To determine whether an individual is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

## III.   EVIDENCE AND ALJ'S DECISION

Ms. Parten's case spans more than ten years and three ALJ hearings. Because of the voluminous record, the court outlines only the evidence relevant to Ms. Parten's arguments on appeal. The court then summarizes the most recent ALJ's decision.

### 1.   Evidence Before the 2023 ALJ

In 2008, Ms. Parten saw Dr. Sterling Taylor for psychotherapy. (Doc. 5-8 at 153). After six weekly sessions, Dr. Taylor diagnosed Ms. Parten with bipolar I disorder, obsessive-compulsive disorder, and panic disorder, noting that she suffered from panic attacks, dysphoria, depression, rages, suicidal ideations, hopelessness, a fear of death, and a "number of obsessions." (*Id.* at 154–55). He opined that

Ms. Parten was "totally and permanently disabled to work." (*Id.* at 152). But no record of Ms. Parten's six sessions accompanies Dr. Taylor's report. (*See id.*).

Dr. Taylor referred Ms. Parten to Dr. Bruce Atkins, a psychiatrist, who treated Ms. Parten from 2008 until 2011. (Doc. 5-8 at 158–183). He diagnosed Ms. Parten with schizoaffective bipolar disorder, obsessive-compulsive disorder, panic disorder, and sleep apnea. (*Id.* at 182–83). During that time, Ms. Parten attempted to commit suicide by overdosing on medication and was admitted to Northport Medical Center. (Doc. 5-8 at 5). Leading up to the event, Ms. Parten had not complied with her prescribed treatment. (*Id.* at 17).

When Ms. Parten applied for disability in 2011, her then-husband completed a function report on her behalf. (*See* doc. 5-7 at 14–21). He reported that she needed some reminders to bathe and take her medication. (*Id.* at 16, 19). She was anxious to go to new places, forgot what she was doing, thought obsessively about death, did not drive, and could not be left alone for a long period of time. (*Id.* at 15, 17, 19–20). However, she could prepare simple meals, get along with authority figures, sometimes follow written instructions, get along with others, go shopping, and maintain her personal care. (*Id.* at 15–20). In June 2011, Dr. Hope Jackson reviewed Ms. Parten's record and found that Ms. Parten had mild and moderate limitations in three of the four paragraph B criteria for the listed impairments in 20 C.F.R. pt. 404,

subpart P, appendix 1 based on the function report and other evidence. (*See* doc. 5-8 at 184–94).

In 2012, Ms. Parten visited the West Alabama Mental Health Center, where she reported suicidal thoughts, hallucinations, mania, panic, depression, and anxiety. (Doc. 5-9 at 3, 5–6). But Ms. Parten had normal speech, mood, impulse control, memory, judgment, and productivity. (*Id.*). A month later, after adherence to prescribed medication and therapy appointments, she reported moderate improvements. (*Id.* at 3–4).

In February 2013, Dr. Taylor opined that Ms. Parten's ability to function was highly variable. (*See* doc. 5-9 at 16–17). He found mild or moderate limitations in her abilities to: remember, understand, and carry out simple and complex instructions; interact with supervisors and coworkers; respond to customers or the public; make judgment calls in simple work situations; and maintain daily living activities and personal habits. (*Id.*). He found marked or extreme limitations in her abilities to respond to work pressure and changes in her routine, use judgment in complex situations, and maintain concentration for more than two hours. (*Id.* at 16). Finally, Dr. Taylor noted that medication was "essential" for Ms. Parten to function. (*Id.* at 17).

Around this time, Ms. Parten lived with her mother and brother. (Doc. 5-10 at 106–07). She also reported improvements in her depression and other symptoms.

(Doc. 5-9 at 19–20). She helped take care of her mother and regularly drove to the grocery store. (Doc. 5-10 at 106–07). Additionally, she completed basic household tasks, such as cooking, cleaning, and laundry. (*Id.* at 113–14, 124–26). But, after her overdose, Ms. Parten was not allowed to give her mother medication. (*Id.* at 114, 132–33). She attended the University of Phoenix online, and she reported trouble concentrating and understanding material and needed help from her classmates. (*Id.* at 109–10, 123–24).

At her first hearing in 2013, Ms. Parten testified that she repeatedly failed to take her prescription medication in accordance with her doctors' instructions. (Doc. 5-10 at 101, 117–18). She stopped taking her medication in part because she did not have insurance and her father stopped paying for it and in part because it caused significant weight gain. (*Id.*). In total, she did not take her bipolar medication for more than eighteen months. (*Id.*). But she had been going to weekly therapy sessions to address her mental health (*Id.* at 119–20).

In late 2013, she began treatment with the UAB Community Psychiatry Program. (*See* doc. 5-15 at 26–94). Ms. Parten reported thoughts of self-harm, mania, hallucinations, panic attacks, and anxiety. (*Id.* at 267–27, 30). But she also reported having a close relationship with members of her family and several friends whom she saw often. (*Id.* at 29). Dr. Rachel Julian prescribed Ms. Parten Abilify, after which she reported some improvement, but she stated that Abilify made her

tired. (Doc. 5-15 at 33–34). She still heard voices and felt agitated. (*Id.* at 34)*.* Thus, Dr. Julian changed her medication to Ziprasidone. (*Id.*)

In February 2014, Ms. Parten reported trouble getting medication and a mixed mood. (Doc. 5-15 at 38–41). She then resumed taking Latuda but was instructed to stop the next month because she developed a rash. (*Id.* at 41, 44). Dr. Julian put her back on Abilify. (*Id.* at 44). When taking Abilify, Ms. Parten had fewer panic attacks and felt less anxious. (Doc. 5-15 at 48). It made her a "little sleepy," but she reported no other side effects. (*Id.* at 48).

In August 2014, Ms. Parten felt depressed because of her boyfriend's death and her father's illness. (Doc. 5-15 at 51). She had not been "completely compliant" with taking her medication because she felt like it was "not strong enough when bad things happen," and she also stopped attending therapy. (*Id.*). Although Ms. Parten agreed to resume medication and therapy, she reported depression, paranoia, and mood swings three months later. (*Id.* at 55). In addition, Ms. Parten's auditory hallucinations, night terrors, and stress continued. (*Id.* at 58–59).

Over the next several months, Ms. Parten reported on-and-off compliance with her medication, high anxiety, and high stress. (Doc. 5-15 at 58–74). In September 2015, she experienced no side effects from Abilify but also worse hallucinations, energy levels, anxiety, and depression. (*Id.* at 69–74). The next month, Ms. Parten stated that her prescription assistance program would no longer

carry the drug. (*Id.* at 77). Ms. Parten continued to obtain and take Abilify through December 2015 and reported that Abilify reduced her hallucinations, although she still suffered from episodes of mania and depression. (*See id.* at 81).

In 2016, Ms. Parten reported she was doing "OK," even though her manic episodes persisted. (Doc. 5-15 at 85). She had no side effects from Topamax and reported no trouble getting her medication, but she also had not been fully compliant. (*Id.*). Later that year, she stopped taking medication because it made her sleep all day. (*Id.* at 89). After resuming medication, Ms. Parten reported positive progress, including no anxiety, suicidal ideations, or sleep issues. (Doc. 5-15 at 92–93). She had a positive mood, went to the beach, and reported no side effects from her medicine. (*Id.*). Thus, Dr. Julian opined that Abilify put Ms. Parten's bipolar disorder in "partial remission." (*Id.* at 91; doc. 5-10 at 52–53).

Around the same time, Ms. Parten reported drowsiness while driving. (Doc. 5-15 at 93; doc. 5-10 at 45–47). She lived with her older brother and his wife, on whom she relied for support. (Doc. 5-10 at 44–45). At their home, she had a consistent daily routine, comprised of listening to music and watching YouTube videos. (*Id.* at 63–65). She also helped take care of the family's dogs and cats. (*Id.* at 67). But she rarely left the house or interacted with strangers. (*Id.* at 67–69).

Ms. Parten continued her schooling at a new university, where she received Bs in some of her courses and planned to graduate in May 2017. (Doc. 5-10 at 47–

50, 53–55). However, Ms. Parten struggled with test-taking and received accommodations from her school. (*Id.* at 54–55). She took only one class at a time, and she asked frequent questions about assignments. (*Id.* at 55, 76). Ms. Parten also quit going to therapy because "they were already telling [her] stuff [she] already knew." (Doc. 5-10 at 52). She claimed she could not take Abilify because it was too costly. (*Id.* at 53).

Ms. Parten reported that between July 2016 and November 2021, she stopped receiving treatment for her mental health because it was too costly and she had moved away from Birmingham, where her mental health providers were located. (Doc. 5-16 at 55–57, 74, 94–95). She "figured [she] could try to do better on [her] own" and "thought it was a good idea" to stop taking medication without consulting a doctor. (*Id.*; *see also id.* at 73–74) She also reported that the medication caused weight gain and stomach irritation. (Doc. 5-16 at 73).

During that time, there were also moments where Ms. Parten was "really happy" because she was with her ex-fiancé. (*Id.* at 65). She would "do really good" until the two fought, which would cause her to enter a period of depression for several days where she would not want to shower or leave her bed. (*Id.* at 66). Because she spent most of her time with her ex-fiancé, Ms. Parten lost contact with her friends and chose instead to interact with people online. (Doc. 5-16 at 70, 81). She reported that being around others made her nervous. (*Id.* at 79). For example,

she held a job at a call center for a short period but would have "melt downs," and when she went to social events, she would panic and cry. (*Id.* at 51, 79).

Nevertheless, while living with her brother, Ms. Parten routinely interacted with her nieces and talked to her family every morning while they got ready. (Doc. 5-16 at 84–85). When her nieces came home from school, she helped them with their homework. (*Id.* at 85). And at the end of the day, the family ate dinner together. (*Id.*).

Although she did not receive mental health treatment for several years, Ms. Parten began seeing a primary care physician, Dr. Renee Davis, in February 2019. (*See* doc. 5-23 at 87–88). Ms. Parten did not report any struggles with anxiety or depression at that time. (*See id.*). But in November 2021, Ms. Parten told Dr. Davis that she planned on overdosing after finding out that her then-fiancé had cheated on her. (Doc. 5-22 at 18). She was admitted to Grandview Medical Center, where she reported depression, auditory hallucinations, and suicidal ideations. (*Id.* at 45). She reported improvements after receiving medication, attending group therapy, and leaving her room to socialize with others. (*Id.* at 108). At discharge, the center instructed her to follow up with a mental health clinic and resume Abilify. (*Id.* at 18–19).

At Ms. Parten's initial appointment at the mental health clinic, she said that she "ha[d] not been on meds in several years and felt like [she] was doing okay," but that several stressors, including getting COVID-19 and learning of her then-fiancé's

cheating, triggered her anxiety and depression. (Doc. 5-23 at 97). She received a prescription for Abilify. (*Id.* at 98). In January 2022, Ms. Parten reported that she was "okay" but still had manic symptoms, irritability, anxiety, and panic attacks. (*Id.* at 93). The physician noted that she was cooperative, logical, and alert, and instructed Ms. Parten to continue her medication. (*Id.* at 94). Ms. Parten reported relief after taking Abilify, which she continued taking through October 2022. (Doc. 5-23 at 28–29, 52).

2.    The 2023 ALJ's Decision

The 2023 ALJ found that Ms. Parten had not engaged in substantial gainful activity since March 2011. (Doc. 5-16 at 20). She determined that Ms. Parten had four severe impairments—bipolar disorder, obsessive compulsive disorder, panic disorder, and obesity—and four non-severe impairments. (*Id.*). At step three, the ALJ found that Ms. Parten did not suffer from an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. pt. 404, subpart P, appendix 1. (*Id.* at 20–23). She found that Ms. Parten had no more than moderate limitations in the paragraph B criteria, and she did not meet the paragraph C criteria.

The ALJ then determined that Ms. Parten had the residual functional capacity to perform a reduced range of light work. (Doc. 5-16 at 23). She restricted Ms. Parten's residual functional capacity so that she would "have work-related

12

interaction with the general public" and "occasional work-related interactions with supervisors and coworkers." (*Id.*).

Based on that residual functional capacity and the testimony of a vocational expert, the ALJ found that Ms. Parten could perform jobs that exist in significant numbers in the national economy such as office helper, hand washer, and silver wrapper. (*Id.* at 36–37). Accordingly, the ALJ determined that Ms. Parten had not been under a disability from her alleged onset date through the date of the decision. (*Id.* at 37).

## IV. DISCUSSION

Ms. Parten argues the court should reverse and remand the Commissioner's decision because substantial evidence does not support the ALJ's: (1) finding that Ms. Parten does not meet the requirements for Listing 12.04; (2) failure to credit her subjective testimony about her inability to afford medication, side effects of medication, and severity of her symptoms; and (3) decisions about the weight given to Dr. Atkins's and Dr. Taylor's opinions. (Doc. 8 at 2).

### 1. Listing 12.04

A claimant bears the burden of proving that she meets a listed impairment. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991). "To meet a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and

the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (quotation marks omitted).

Listing 12.04 concerns depressive, bipolar, and related disorders. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04; *see* 20 C.F.R. § 416.925. The only part of Listing 12.04 in dispute here is paragraph B, which requires marked limitations of two, or extreme limitation of one, of the following areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting and managing oneself. *Id.* § 12.04(B). The ALJ found that Ms. Parten has moderate limitations in all four areas. (Doc. 5-16 at 21–22).

Ms. Parten does not argue that any alleged error in relying on these facts changes the ALJ's ultimate determination of her limitations. (*See* doc. 8 at 9–11). Although she bears the burden of proving she meets the criteria, *Barron*, 924 F.2d at 229, Ms. Parten never argues she has a marked or extreme limitation in any category (*see id.*).

Ms. Parten argues first that the ALJ erred by disregarding the court's previous holding that substantial evidence did not support the ALJ's decision to discount her description of the intensity of her mania and depression based on her ability to do some activities. (Doc. 8 at 10). The court previously held that the 2017 ALJ did not properly consider the full picture of Ms. Parten's activities by concluding she was

not disabled because she took online classes, had a dog, took care of her father, and went to the beach. (Doc. 5-17 at 58–60). Unlike the 2017 ALJ, the current ALJ relied on different evidence and did not selectively rely on certain pieces of information. The ALJ noted that Ms. Parten struggled in school at times (doc. 5-16 at 24), could not take care of her father (*id.* at 25), and had up-and-down time periods (*id.* at 23– 26). Additional documents show that Ms. Parten reported obtaining a university degree. (Doc. 5-22 at 62). The ALJ also relied on different evidence, including that Ms. Parten did not seek mental health treatment for five years (doc. 5-16 at 26, 29– 30, 54–55). Thus, the ALJ did not repeat the same analysis.

Ms. Parten also argues that substantial evidence did not support the ALJ's findings that she could drive a car, comprehend her online courses, manage her medical regimen, manage her personal care, and manage her own finances. (Doc. 8 at 11). But the court finds that substantial evidence supports the ALJ's statements to which Ms. Parten objects.

As for the ALJ's finding that Ms. Parten could drive, the ALJ considered Ms. Parten's ability to drive when determining her restrictions on understanding information and concentrating. (Doc. 5-16 at 21–22). Ms. Parten stated that she could not drive in her function report. (Doc. 5-7 at 17). But throughout her application period, Ms. Parten drove to various locations. For example, in 2013, she testified that she drove each week. (Doc. 5-3 at 59, 64). In fact, she drove herself to

the 2013 hearing in Montgomery. (*Id.* at 57, 60). In 2016, she testified that she no longer drove, but she also admitted she had driven with difficulty a month before. (Doc. 5-10 at 37, 45–46). In 2022, Ms. Parten testified that she occasionally drove to and from her ex-fiancé's house to visit her animals though she had two panic attacks when she did so. (Doc. 5-16 at 86). Moreover, when Ms. Parten detailed struggles driving it was because of her sleep apnea and panic attacks—not her ability to understand information. (*See, e.g.*, doc. 5-10 at 45; doc. 5-16 at 86).

With respect to the ALJ's finding that Ms. Parten understood her online courses, the record reflects that she performed better in online classes after receiving accommodations from her new university. At her 2016 hearing, she testified that she was set to graduate in May 2017 and made Bs in some of her classes. (Doc. 5-20 at 46, 57–59). She stated that she could understand the material after asking her professors questions and was good at writing papers. (*Id.* at 59, 63–64). Indeed, Ms. Parten reported that she ultimately obtained her degree. (Doc. 5-22 at 62; doc. 5-23 at 97).

The court also finds that evidence in the record supports the ALJ's statement that Ms. Parten could manage her own medication regimen. In her function report, Ms. Parten indicated she needed reminders to take her medication, but she otherwise noted no restrictions. (Doc. 5-7 at 16). Ms. Parten also testified that she understood the consequences of failing to follow prescribed treatment. (*See* doc. 5-10 at 53

(stating that she knew that medicine helped her); doc. 5-15 at 51). Although her family did not allow her access to medication at times, she repeatedly testified that she made the decision to not take her medication from 2016 to 2021 either because she lacked insurance or because she was feeling okay and did not believe she needed medication. (*See* doc. 5-16 at 54–55, 73–74). When Grandview Medical Center discharged Ms. Parten in 2021, her physicians noted that she could manage her treatment and understand medication instructions. (Doc. 5-22 at 24).

Regarding her ability to manage her personal care, Ms. Parten admitted in her function report that she had no problems with personal care, although she sometimes needed reminders to bathe. (Doc. 5-7 at 15–16). Her medical records rarely reported any hygiene issues. (*See, e.g.*, doc. 5-15 at 55, 77, 85, 93 ("Well groomed"); doc. 5-22 at 74 ("Neatly Groomed/Good Hygiene"); doc. 5-22 at 24; doc. 5-23 at 94, 96. And Ms. Parten routinely took care of herself and other family members. (*See* doc. 5-10 at 124; doc. 5-15 at 11 ("takes care of the pets and works around the house"); doc. 5-15 at 72 ("cleans and cooks while her family is at work during the day"); doc. 5-16 at 85 (explaining that Ms. Parten cooked her former fiancé breakfast and lunch, went grocery shopping, and currently helps her nieces with their homework); doc. 5-22 at 239 (finding that Ms. Parten did not have issues taking care of herself)).

Ms. Parten indicated she could manage her own finances. In her function report, Ms. Parten admitted she could pay bills, count change, handle a savings

account, and use a check book. (Doc. 5-7 at 17). She also stated that her ability to handle money had not changed since her conditions started. (*Id.* at 18).

A reasonable mind "might accept [this evidence] as adequate to support [these] conclusion[s]." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Accordingly, this court must affirm, even if there is some conflicting evidence. *See Crawford*, 363 F.3d at 1158–59. The court will not remand on the ground that substantial evidence does not support the ALJ's determination that Ms. Parten did not meet the requirements of paragraph B of Listing 12.04.

### 2.    Substantial Evidence Supports the ALJ's Decision to Discount Ms. Parten's Testimony.

Ms. Parten also argues that substantial evidence does not support the ALJ's determination to discount various reasons she proffered for not taking her medication—including that she could not afford her medications, she suffered from medication side effects, and her condition prevented her compliance—and discounted her subjective symptoms. (Doc. 8 at 11–18). The court will address each argument in turn.

#### a.    Noncompliance with Medication

First, Ms. Parten argues that the ALJ erred in concluding that the evidence was inconsistent with her claim that she could not afford Abilify before June 2016 or between 2018 and 2023. (*Id.* at 11, 14, 18). Social security regulations prevent finding a claimant disabled if they fail to follow prescribed treatment without good

reason. 20 C.F.R. § 416.930(b). But poverty is a "good reason" for, and will thus excuse, noncompliance. *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988).

Here, the ALJ considered Ms. Parten's testimony that she could not afford her medication but found that testimony unpersuasive in light of other evidence in the record. (Doc. 5-16 at 26–27). For example, the ALJ noted that Ms. Parten repeatedly failed to take Abilify when cost was not an issue. (*Id.*). From 2013 to 2016, a prescription assistance program provided Ms. Parten with Abilify when prescribed (doc. 5-16 at 59), yet she did not consistently take the medication and chose not to reapply to that program. (*See* doc. 5-10 at 117–20; doc. 5-15 at 51; doc. 5-16 at 60). In 2018, Ms. Parten obtained insurance, through which she filled numerous prescriptions in 2021 (*see* doc. 5-16 at 62; doc. 5-20 at 154–56), but she did not seek mental health treatment or fill any Abilify prescriptions until late 2021 (*see, e.g.*, doc. 5-22 at 18–19, 139, 141; doc. 5-23 at 28–29, 97; doc. 5-20 at 154–56). After Ms. Parten began retaking Ability in late 2021, the price of the drug was roughly $15 each time she filled it. (*See* doc. 5-20 at 154–55). Finally, at the most recent hearing, Ms. Parten testified that she could obtain Abilify. (Doc. 5-16 at 73). Ms. Parten suggests that the lack of some evidence supports her argument (doc. 8 at 12), but it is Ms. Parten's burden to prove—not the ALJ's to disprove.

In addition, the ALJ noted that Ms. Parten offered various reasons, other than cost, for not complying with her medication regimen or therapy. (*See, e.g.*, doc. 5-

16 at 55). At her 2017 hearing, she testified that she stopped therapy because her providers were "telling [her] stuff that [she] already knew." (Doc. 5-10 at 52). In 2022, she reported that she stopped therapy because she "didn't feel like it was worth it" and she would "try to do better on [her] own." (Doc. 5-16 at 55). Unlike previous decisions, the ALJ considered Ms. Parten's ability to afford medication, and substantial evidence supports the ALJ's determination to discount her testimony. *See Dawkins*, 848 F.2d at 1213.

Second, Ms. Parten argues that the ALJ erred in determining that Abilify did not cause troublesome side effects. (Doc. 8 at 16–17). The ALJ must consider side effects of the medication. 20 C.F.R. § 416.929(c)(3)(iv). Here, the ALJ considered the side effects of Abilify but concluded that those side effects did not prevent Ms. Parten from taking the medication because she largely did not report side effects with Abilify. (Doc. 5-16 at 27–28, 30–31). For instance, sometimes she complained that Abilify caused weight gain and made her drowsy. (Doc. 5-10 at 101, 117–18). Other times, she reported that she lost weight with Abilify. (Doc. 5-15 at 8). Most times, Ms. Parten reported no side effects from the drug. (*Id.* at 17; doc. 5-16 at 73; *see* doc. 5-20 at 69). Thus, substantial evidence supports the ALJ's conclusion that Ms. Parten's side effects did not prevent her from taking the medication.

Third, Ms. Parten argues that her diagnosis is "good reason" under the regulations to excuse compliance because of her lack of impulse control. (Doc. 8 at

15–16). Even assuming that Ms. Parten's underlying impairment would excuse noncompliance, her medical records show, at best, mixed findings on the severity of her impulse-control issues. (*See* doc. 5-8 at 118 (finding poor impulse control and judgment); doc. 5-9 at 16 (noting limitations in judgment); doc. 5-9 at 6, 16, 45, 48, 56, (noting normal impulse control and judgment); doc. 5-15 at 72; doc. 5-22 at 65, 75, 84 (recording "intact" judgment)). Moreover, the evidence demonstrates that Ms. Parten could understand and manage treatment (doc. 5-22 at 24), and she understood the consequences of failing to comply with prescribed treatment (*see* doc. 5-10 at 53 (stating that she knew that medicine helped her); doc. 5-15 at 51). Accordingly, substantial evidence shows Ms. Parten understood and could follow prescribed treatment and supports the ALJ's determination that she could manage her medical regimen.

### b.    *Subjective Symptoms*

During step four, the ALJ must determine the claimant's residual functioning capacity and will consider all evidence in the case record, including the claimant's subjective symptoms. *See* 20 C.F.R. § 416.945. An "individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability." 42 U.S.C. § 423(d)(5)(A). A claimant can establish disability through testimony of pain or other subjective symptoms by showing evidence of an underlying medical condition and either (1) "objective medical evidence confirming the severity of the alleged

pain arising from that condition" or (2) "that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Malak v. Comm'r of Soc. Sec.*, 131 F.4th 1280, 1287 (11th Cir. 2025) (quotation marks omitted).

"[W]hen a claimant's subjective complaints are inconsistent with medical and other evidence, an ALJ may discredit the claimant's statements." *Rodriguez v. Soc. Sec. Admin.*, 118 F.4th 1302, 1316 (11th Cir. 2024). But if "a claimant testifies as to his subjective complaints of disabling pain and other symptoms, . . . the ALJ must clearly articulate explicit and adequate reasons for discrediting the claimant's allegations of completely disabling symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks omitted). The credibility determination must be sufficient to enable the court "to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Id.* (first alteration in original) (quotation marks omitted).

Here, Ms. Parten repeats many of her arguments that she made about the ALJ's step three analysis. (*Compare* doc. 8 at 9–11, *with id.* at 17–18). The court rejects these arguments for the same reasons outlined above. To the extent Ms. Parten also argues that substantial evidence does not support the ALJ discounting her subjective testimony about the severity of her symptoms, the court

disagrees. The ALJ found that Ms. Parten's activities were not consistent with her claims.

Unlike the 2017 ALJ who relied on Ms. Parten owning a dog, taking care of her father, and completing online classes to discount her subjective testimony (*see* doc. 5-17 at 58–60), the ALJ here noted that Ms. Parten did not take any medication or seek any other form of mental health treatment for five years (doc. 5-16 at 26–28). In 2016, Ms. Parten stopped receiving prescription assistance because she chose not to reapply. (Doc. 5-16 at 60). And Ms. Parten did not report any mental health problems to her primary care physician until November 2021. (*See* doc. 5-23 at 60–88). When she did receive treatment, she said that she "ha[d] not been on meds in several years and felt like she was doing okay." (*Id.* at 97). According to Ms. Parten's testimony, during that time she met her former fiancé, got engaged, and went to the grocery store—all while not taking any form of medication or seeking any treatment. (*See* doc. 5-16 at 85). Thus, substantial evidence supports the ALJ's conclusion that Ms. Parten's activities contradicted the alleged severity of her symptoms.

### 3.    The ALJ Did Not Err in Weighing the Physicians' Opinions

Finally, Ms. Parten argues the ALJ erred by not giving appropriate weight to the opinions of treating physicians Dr. Bruce Atkins and Dr. Sterling Taylor. (Doc. 8 at 18–19).

23

Regulations in effect at the time of Ms. Parten's application required an ALJ to give treating physicians' opinions controlling weight if the opinion is well supported by "medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with the "other substantial evidence in your case record." 20 C.F.R. § 416.927(c)(2).[1] Likewise, the Eleventh Circuit has stated that absent "good cause," a treating physician's opinion is entitled to "substantial or considerable weight." *Winschel*, 631 F.3d at 1179. Such "good cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* If the ALJ does not grant controlling weight to the treating physician's opinion, the ALJ still must weigh the opinion based on various factors outlined in the regulations. *See* 20 C.F.R. § 416.927(c)(2)–(6).

To receive the "controlling weight" presumption, the physician must offer a medical opinion. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what

---

[1] Since Ms. Parten's application, the regulations changed the weighting formula ALJs must give to physician opinions. *See* 20 C.F.R. § 416.920c. But those changes apply only to claims filed on or after March 27, 2017. *Id.*

[the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 416.927(a)(1); *Winschel*, 631 F.3d at 1178–79.

### a.    Dr. Atkins's Records

In October 2009 and January 2010, Dr. Atkins suggested that Ms. Parten seek disability benefits. (Doc. 5-8 at 101, 162). Ms. Parten contends that this recommendation was a medical opinion entitled to controlling weight. (Doc. 8 at 18–19). But that recommendation is not a medical opinion as defined by the regulations. *See* 20 C.F.R. § 416.927(a)(1), (d)(1) ("A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.").

To the extent Ms. Parten argues Dr. Atkins's medical records are due controlling weight, most of the records from Dr. Atkins do not qualify as medical opinions. *See* 20 C.F.R. § 416.927(a)(1). As the ALJ pointed out, all of Dr. Atkins's records are handwritten, and many are illegible. (*See generally* doc. 5-8 at 158–183). These records fall short of the statements, details and judgments needed to be a medical opinion. *See Winschel*, 631 F.3d at 1178–79.

Second, even if some records are medical opinions, the ALJ explained that she gave those opinions only partial weight because Dr. Atkins treated Ms. Parten only for the first few months of the alleged disability period and his treatment notes showed improved symptoms with proper medication. (Doc. 5-16 at 31–32). This

description of the records is accurate. (*See* doc. 5-8 at 158–183). Accordingly, substantial evidence supported the ALJ's decision to afford less than controlling weight to Dr. Atkins's opinion. *See Winschel*, 631 F.3d at 1178–79.

> b.    *Dr. Taylor's Opinion*

Dr. Taylor was Ms. Parten's treating physician at times from 2008 until 2011. (Doc. 5-16 at 32). In 2011, he opined that Ms. Parten was "totally and permanently disabled." (Doc. 5-8 at 152–55). In 2013, he opined that Ms. Parten had several limitations, ranging from mild to extreme. (Doc. 5-9 at 16).

The ALJ assigned the same weight to Dr. Taylor's opinion as the 2017 ALJ. (*Compare* doc. 5-10 at 25–26, *with* doc. 5-16 at 32–33). This court previously found no error. (Doc. 5-17 at 61–63).  And the court agrees the ALJ did not err for the same reasons. *See Crawford*, 363 F.3d at 1159.

## IV.    CONCLUSION

The court **WILL AFFIRM** the Commissioner's final decision. The court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this September 30, 2025.

_____

**ANNEMARIE CARNEY AXON**